

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 6, 2025

**BY ECF**
Hon. Colleen McMahon
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

    Re:    *United States v. Rui-Siang Lin*, 24 Cr. 178 (CM)

Dear Judge McMahon:

    The Government writes to request that the Court permit the parents of a deceased victim of the defendant's crimes to address the Court during sentencing in this matter. The defendant objects. A ruling on this narrow issue in advance of sentencing is requested because Victim-1's family lives out of state and will need to make travel arrangements for the sentencing, which is scheduled for December 2, 2025.[1]

    **A.  Relevant Background**

    On December 16, 2024, Rui-Siang Lin, the defendant, pled guilty to narcotics conspiracy, money laundering, and conspiracy to sell adulterated and misbranded medication—namely, Counts Two, Three, and Four of the Indictment. These charges are the result of Lin's role as "the principal administrator and operator of Incognito, one of the largest illegal narcotics marketplaces on the internet." (PSR ¶ 14.) Incognito sold "approximately $100,000,000 worth of heroin, cocaine, methamphetamine, LSD, other illegal narcotics, and misbranded prescription medication" to hundreds of thousands of customers throughout the world. (PSR ¶ 18.)

    Incognito was an "e-commerce platform" that operated on the darkweb. Incognito enabled its "customers" to purchase narcotics from "vendors," who advertised narcotics on Incognito. Each vendor was required to register with Incognito and if approved, could list any illegal narcotic for sale for any price they chose. After registering with Incognito, customers could select which narcotics to purchase from which vendor and pay for those narcotics using cryptocurrency in transactions facilitated by Incognito's "bank." Both vendors and customers used Incognito's bank to conduct narcotic transactions; therefore, both vendors and customers deposited money with Incognito and used Incognito to exchange money. For its services, Incognito earned approximately 5% of the purchase price of every narcotic sold on Incognito.

---

[1] The parties have discussed this issue and have been unable to resolve it. The defense requests until October 14, 2025 to respond to this letter.

"Pharaoh"—*i.e.* Lin's online identity—was the principal administrator of Incognito market. In that role, Lin was responsible for developing Incognito's source code. (*See* PSR ¶ 20.) That is, Lin decided what features to offer on the site, imposed rules, designed its appearance, and decided who else, if anyone, should have administrator access privileges on the site, among other things. Lin also controlled Incognito's bank. As such, Lin controlled Incognito's assets, paid its staff, and in March 2024 decided to close the marketplace and take for himself all of the cryptocurrency in Incognito's bank, which included cryptocurrency purportedly allocated to Incognito customers and vendors. (*See* PSR ¶ 60 ("In March 2024, LIN closed Incognito and refused to return funds vendors and customers held with in Incognito's bank. LIN threatened to disclose Incognito's users' transaction history on the Internet unless the user paid LIN an additional fee.").)

With respect to misbranded medication, sales on Incognito included sales of pills, which vendors marketed as "oxycodone" but were in fact fentanyl. This was confirmed, among other ways, by undercover purchases made by law enforcement. For example, on November 28, 2023, a law enforcement officer ordered "M30 Pressed OXY PILLS -HIGH QUALITY -USPS" from a vendor on Incognito. "M30" is a street name for 30 milligram oxycodone pills given the presence of a "M" on branded pills of oxycodone. After placing the order, on December 5, 2023, law enforcement officers received a package that contained approximately five tablets imprinted with a "M." The five tablets weighed approximately 0.569 grams and tested positive for the presence of fentanyl. (PSR ¶ 30.iii; *see also* ¶¶ 30.ii; 30.iv.)

On September 13, 2022, a 27-year-old man, and customer of Incognito market ("Victim-1"), was fatally poisoned by fentanyl that he purchased from Lin's marketplace. Specifically, based on data from Incognito's server, a username bearing Victim-1's middle initial followed by his last name ("Username-1") "finalized"—*i.e.* consummated transactions—approximately eight orders from vendors on Incognito. Based on Incognito's server data, seven of those transactions were purchases for "Pressed Oxycodone m30 Pill x5" from an Incognito market vendor named "redlightlabs." The final two of these transactions were finalized on September 6, 2022.

On September 13, 2022, Victim-1 was scheduled to visit his parents' home. But he did not arrive. Concerned, Victim-1's father traveled to his son's apartment and discovered his son's body. Victim-1 was lying face down on his couch, with half his body on the floor. His father "knew immediately that he was dead." (Ex. A.)[2] Victim-1's body was discovered near a partial blue pill. Additionally, approximately twelve other blue "m30" pills were found, along with additional assorted pills, in a prescription bottle in Victim-1's residence. An autopsy report assessed that Victim-1's cause of death was "fentanyl toxicity."

Los Angeles-based FBI special agents, who are not part of the Incognito investigation that led to Lin's arrest, investigated the individuals who operated the "redlightlabs" identity. In the course of that investigation, the FBI obtained a laptop belonging to Rajiv Srinivasan which contained an "Evernote" document (a shareable word processing program) that contained narcotics

---

[2] Exhibit A contains the letters that Victim-1's family has submitted for sentencing, which are provided under seal.

order histories for various "redlightlabs" customers from May 2022 to November 2022. Included in the Evernote file were seven orders placed by Username-1. Notably, the entry for September 7, 2022 reflects the customer name—Victim-1's middle name and his last name—and an address, which is the address of Victim-1's apartment. On the Evernote file, the total amount for the September 7 order is "15" "m30 pills," which matches the amount of the two September 6, 2022 entries from the Incognito server. (The difference in dates is likely due to time zones differences.)

On or about June 5, 2023, the two individuals behind the "redlightlabs" identity, Michael Ta and Rajiv Srinivasan, pled guilty to conspiracy to distribute and to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A), in the Central District of California. Under the terms of their plea agreements, they stipulated that they conspired to "operate[ ] the account 'redlightlabs' on the dark web to advertise and accept orders for controlled substances." They also stipulated that Srinivasan "communicate[d] with Ta regarding the distribution of controlled substances, including sending information to Ta to mail controlled substances to customers who had ordered those drugs." *United States v. Srinivasan*, 22 Cr. 183 (DOC), Dkt. 53 at 29 (C.D. Cal. April 20, 2023) (Ex. B). They further admitted that they "mass marketed purported 'M30' [oxycodone] pills which [they] knew in fact contained fentanyl through multiple dark web marketplaces, including . . . . Incognito." *Id*. at 13. They admitted to causing the death of several victims including:

> D.R.C. [*i.e.* Victim-1], of . . . , Arkansas, who died of a fentanyl overdose on or about September 13, 2022, at the age of 27 years old. On or about September 7, 2022, [Srinivasan] and Ta accepted an order from D.R.C. for 15 "M30" pills containing fentanyl, which Ta shipped to D.R.C. the next day. D.R.C. ingested some of those pills, and the use of such pills resulted in D.R.C.'s death and serious bodily injury. But for the use of the fentanyl that defendant distributed, victim D.C. would have lived.

*Id.* at 15.[3]

### B. Applicable Law

Under the Crime Victim Rights Act ("CVRA") victims of an offense have the right to be heard at court proceedings, including sentencing. *See* 18 U.S.C. § 3771(a)(4) ("A crime victim has the . . . right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding"). A "crime victim" is someone "directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e)(2)(A). That harm may be "physically, financially, psychologically, or otherwise." *United States v. Ray*, 337 F.R.D. 561, 570 (S.D.N.Y. 2020). "The definition of victim under the CVRA is expansive." *Id*. When a victim is deceased, their rights may be asserted by their "legal guardians . . . or the representatives of the crime victim's estate, family members, or any other persons appointed as suitable by the court." 18 U.S.C. § 3711(e)(2)(B); *see also* 18 U.S.C.

---

[3] On or about April 29, 2024, Ta was sentenced to 260 months imprisonment. On or about April 29, 2024, Srinivasan was sentenced to 235 months imprisonment.

§ 3771(b)(1) ("In any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded [their statutory rights].)."

The Second Circuit has held that while statutory victims have a *right* to speak at sentencing, there is no limit on who a district court *may* permit to speak at sentencing. *See United States v. Sansone*, No. 23-6193, 2024 WL 5087518, at *1 (2d Cir. Dec. 12, 2024) ("Assuming *arguendo* that Victim-1 does not qualify as a statutory crime victim, the district court did not err in permitting her to speak during the sentencing hearing. While the CVRA provides certain victims with a statutory *right* to speak, it does not impose limits on who the district court *may* allow to speak.") (emphasis in original); *United States v. Smith*, 967 F.3d 198, 215 (2d Cir. 2020) (noting that "even if Smith is correct that KN1 did not qualify as a statutory "victim" of Smith's most recent child pornography offense . . . Congress has not placed arbitrary limits on what information a district court may consider at sentencing."). Accordingly, it is within the discretion of a district court to permit individuals that fall outside the definition of CVRA the opportunity to speak at a sentencing. *See, e.g.*, *United States v. Hadden*, No. 23 Cr. 6822, 2024 WL 4456203, at *5 (2d Cir. Oct. 10, 2024) (affirming district court's consideration of oral and written impact statements from uncharged victims of the defendant and noting that there is "no doubt that the district court had broad discretion to consider the extensive harm that Hadden caused over many years to numerous uncharged victims, in the context of the sentencing factors listed in 18 U.S.C. § 3553(a)"); *Smith*, 967 F.3d at 215-16 (affirming the district court's consideration of the oral statement of a non-statutory victim at sentencing about "the damaging impact of Smith's abuse on her life" as "relevant to . . . Smith's prior conduct of sexual abuse and also several of the statutory purposes of sentencing—including just punishment, the need for deterrence, and protecting the public from further crimes.").

Indeed, pursuant to Title 18, United States Code, Section 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Section 3661 "codifies the longstanding principle that sentencing courts have broad discretion to consider various kinds of information." *United States v. Watts*, 519 U.S. 148, 150 (1997); *United States v. Nordvik*, 21 F. App'x 50, 52 (2d Cir. 2001) ("A sentencing court's discretion is largely unlimited either as to the kind of information [the court] may consider, or the source from which it may come." (internal quotation omitted)).

### C. Victim-1's Parents Should be Permitted an Opportunity to Speak at Sentencing

Irrespective of whether Victim-1's parents qualify as statutory victims, the defense does not appear to dispute that Victim-1 was a customer of the Incognito market who died of fentanyl toxicity. His parents' testimony about the impact Incognito market had on the community, and particularly narcotics users, is relevant to this Court's consideration of an appropriate sentence for Lin. *See Sansone*, 2024 WL 5087518, at *1 (holding that even if Victim-1 was not a CVRA victim their "testimony about the damaging effects of [the defendant's] conduct was relevant to the district court's consideration of the statutory purposes of sentencing"); *see also United States v. Combs*, No. 24 Cr. 542 (AS), Dkt. 520, at *2 (S.D.N.Y. Oct. 2, 2025) (permitting a non-statutory victim to speak at sentencing where the defense will have a "fair opportunity" to respond to that individual's statements (citing *Sansone*, 2024 WL 5087518, at *1)). For this reason alone, and without having

to determine now whether they qualify as statutory victims, the Court should permit Victim-1's parents to address the Court during sentencing in this matter.

To the extent that the Court decides to reach the merits, Victim-1 was plainly a victim of the defendant's crimes. Victim-1 died of fentanyl poisoning as a result of misbranded oxycodone that he purchased on Lin's online marketplace. Thus, Victim-1 was directly and proximately harmed by Lin's conduct. The Court need look no further than the fact that two of the defendant's co-conspirators—the two individuals who operated the vendor "redlightlabs"—plead guilty to causing Vicitm-1's death through misbranded oxycodone that they sold on Incognito.

Based on briefing before the Probation Department, the defense primarily contends that the Government failed to meet its burden in identifying the source of the fentanyl that fatally poisoned Victim-1 because the half of a blue pill found near Victim-1's body was not tested, and other pills were found in Victim-1's home. This argument largely ignores the evidence—from Incognito's sever as well as redlightlabs's Evernote page—that shows Victim-1 ordered, and received, misbranded oxycodone from redlightlabs within days of his death. The defense also fails to account for the fact that although the half pill found near Vicitm-1's body was not tested, it was photographed and it is substantially similar in appearance to pills that an undercover law enforcement officer purchased from redlightlabs via encrypted messaging app. Indeed, much like the pills Victim-1 purchased on Incognito, the pills that the undercover officer purchased were also marketed as "m30" by redlightlabs. And much like Victim-1, the undercover made the purchase from redlightlabs on September 7, 2022—*i.e.* virtually the same time that Victim-1's order from redlightlabs on Incognito was finalized. The pills purchased by the undercover *were* tested by FBI-LA, and they tested positive for fentanyl. Not only does the defense's argument elide these facts, it also asks this Court largely to ignore that two of Lin's co-conspirators pled guilty to causing Vicitm-1's death. That vendors on Incognito, including redlightlabs, were selling fentanyl designed to look like oxycodone was known to Lin particularly given his plea to Count Four: conspiracy to sell adulterated and misbranded medication.

The briefing before the Probation Department on this issue was substantial but that briefing also revealed a fair amount of agreement among the parties. The parties appear to agree that: (i) based on Incognito server data, Victim-1 finalized eight orders on Incognito for "m30"; (ii) Incognito server data shows that on September 6, 2022, Victim-1 placed two orders for "Oxycodone" m30 pills from Incognito vendor "redlightlabs"; (iii) on September 13, 2022, Victim-1 died of "fentanyl toxicity" at his residence in Arkansas; (iv) two individuals who operated "redlightlabs" pled guilty to distributing fentanyl, which they sold as "Oxycodone," on Incognito and other darknet markets; and (v) those two individuals maintained an Evernote that reflected a shipment of "m30" to Victim-1 on or about September 7, 2022. Despite these facts, the defendant maintains that the Government has not met its burden that drugs purchased on Lin's Incognito marketplace caused Victim-1's death. The defendant is of course entitled to maintain that position, and the Court will likely need to resolve this issue, among others, [4] at Lin's sentencing after receiving sentencing submissions. But the Court need not resolve this issue now. Rather, the Government merely seeks an advanced ruling that the Court will permit Victim-1's parents to address the Court at sentencing so that they can make appropriate travel plans. Given

---

[4] For example, the defense also disputes that Lin was the "principal" administrator of Incognito.

that the defendant appears to concede that Victim-1 was, at the very least, a customer of Lin's Incognito market—who died of fentanyl positioning within days of ordering an opioid from Incognito—the defense would be hard pressed to demonstrate that an address from Victim-1's parents would be wholly irrelevant to the Court's consideration of an appropriate sentence in this matter.

### D.  Conclusion

The Court should permit Victim-1's parents to address the Court at sentencing.

Respectfully submitted,

JAY CLAYTON
United States Attorney

by: /s/_____
Ryan B. Finkel
Nicholas W. Chiuchiolo
Assistant United States Attorneys
(212) 637-6612

cc:     Counsel of Record (by Email)