UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- *v.* -<br><br>RUI-SIANG LIN,<br>a/k/a "Pharaoh,"<br><br>Defendant. | 24 Cr. 178 (CM) |

**THE GOVERNMENT'S SENTENCING MEMORANDUM**

JAY CLAYTON
United States Attorney
Southern District of New York

Ryan B. Finkel
Nicholas W. Chiuchiolo
Assistant United States Attorneys
    - *Of Counsel* -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

I.     Offense Conduct ........................................................................................ 2

     A.    The Incognito Marketplace ................................................................. 2

     B.    Lin Created and Managed the Incognito Bank .................................... 5

     C.    Lin's Management of Incognito Market and Its Staff .......................... 8

     D.    Lin's Promotion and Design of Incognito Led to Its Success ............ 10

     E.    Lin's Decision to Capture the Darknet Opioid Market ..................... 13

     F.    The Overdose Death of Reed Churchill .............................................. 16

     G.    Lin Closes Incognito, Steals from His Coconspirators, and Attempts Extortion ...... 17

     H.    Lin's Arrest ........................................................................................ 18

II.    The Plea Agreement & Lin's Guilty Plea .......................................... 20

III.   Objections to the PSR .......................................................................... 21

DISCUSSION .......................................................................................................... 23

IV.   The Sentencing Guidelines .................................................................. 23

V.    A Sentence of 360 Months Is Appropriate ......................................... 24

     A.    The Seriousness of the Offense and Just Punishment ....................... 25

         1.    The Extraordinary Volume of Lin's Narcotics Trafficking .............. 25

         2.    Lin Caused Harm to Communities Around the World ..................... 27

         3.    Lin Earned Millions of Dollars Leading His Drug Trafficking Network ......... 29

         4.    Lin Mass Marketed Narcotics on the Dark Web While Operating From Foreign Countries ..................................................................... 30

     B.    The Need For Adequate Deterrence ................................................... 31

     C.    Sentences of Similarly Situated Defendants Counsel in Favor of a 360 Month Sentence ............................................................................. 32

     D.    The Defendant's Arguments for the Minimum Sentence are Unpersuasive ............ 36

         1.    Lin's Sentencing Manipulation Claim Fails ..................................... 36

             i.    *Lin is Responsible For the Growth of Incognito* ........................ 38

             ii.    *Lin is Responsible for the Quality of Drugs on Incognito* .......... 41

2.  Lin's Personal Factors and Possibility of Further Prosecution ........................... 42

3.  The MDC .................................................................................................. 43

█   ███████████████ ................................................................................ 44

CONCLUSION ................................................................................................ 45

## PRELIMINARY STATEMENT

Rui-Siang Lin a/k/a "Pharaoh" was the leader of the Incognito Market, which was a sophisticated multiyear conspiracy that used the subterfuge of the dark web to mass market, across this country and throughout the world, several tons of dangerous drugs worth more than $105,000,000.  Lin's Incognito Market was once one of the largest online narcotics marketplaces in the world.  During its approximately 39-month existence, Lin's illicit marketplace sold to more than 450,000 customers, worked with more than 1,800 narcotics vendors, and facilitated more than 640,000 drug sales.  As the leader of Incognito Market, Lin generated more than $6 million in personal profits.   And while Lin made millions, his customers, their families, and their communities suffered.  Tragically, at least one man died from drugs purchased on Lin's Incognito Marketplace.

In March 2024, Lin shut down his marketplace.  He did this not because of a sudden change of heart or an epiphany about the devastation his online empire was causing.  Rather, Lin shuttered Incognito so that he could steal its users' money.  And then Lin attempted to extort them for even more.

Lin's offenses, the devastation he caused, the gargantuan volume of narcotics for which he is responsible, the sophisticated means and methods of the narcotics enterprise he led, and the millions of dollars he collected, are extraordinary. In light of the seriousness of the defendant's offense, the important need for general and specific deterrence, and the need for just punishment, the Court should impose a sentence consistent with the recommendation of the Probation Department: 360 months imprisonment.

# BACKGROUND

## I.    Offense Conduct

### A.  The Incognito Marketplace

Incognito was a prolific e-commerce narcotics platform that operated on The Onion Router network, from approximately October 2020 through March 2024.  The Onion Router Network, which is colloquially known as the "darknet," "darkweb," or "Tor," allows individuals to obscure their true IP addresses and Internet traffic, by encrypting both the content of their internet traffic and the signaling information.  The darknet is often used for criminal activity, including to sell, and purchase, illegal products.  For nearly 15 years, the darknet has been populated by a series of online narcotics bazars that serve as e-commerce platforms for drug dealers to reach customers around the world.  Many darknet markets are fleeting, existing for a matter of months or unable to achieve substantial volumes.  Incognito Market was not a darknet market that passed quietly in the night.  Indeed, due to Lin's technological prowess, marketing skills, and ability to build robust infrastructure, for a time Incognito Market was one of the largest on the internet.

"Pharaoh"—*i.e.* Lin's online identity—was the principal administrator of Incognito Market.  (PSR ¶ 14.)  In that role, Lin was the leader of the enterprise that operated the platform, was in control of Incognito's assets, and was responsible for developing Incognito's source code. (*See* PSR ¶ 20.)  That is, Lin decided what features to offer on the site, imposed its rules, designed its appearance, and decided who else, if anyone, should have administrator or moderator privileges on the site, among other things.  (PSR ¶¶ 20, 22.)  Lin was a founding member of Incognito along with two other administrators ("Administrator-1" and "Administrator-2," respectively).

In or about October 2020, Lin joined Incognito following Administrator-1's invitation to meet (online) Administrator-2.  Lin had previously conspired with Administrator-1 when the two operated another darknet narcotics site called "Potluck," which focused on marijuana sales.  (Lin

Post Arrest Interview ("Lin Intv."), at 11:31.)  Lin programmed Incognito, designed its user interface, and setup a sophisticated network infrastructure.  (PSR ¶¶ 31-32.)

Similar to how other darknet marketplaces have historically operated, Incognito Market did not sell narcotics directly to customers.  Instead, Lin designed Incognito Market to enable its "customers" to purchase narcotics from "vendors," who advertised narcotics on Incognito.  (PSR ¶ 16.)  Each vendor was required to register with Incognito and if approved, could list nearly any illegal narcotic for sale for any price they chose. (PSR ¶¶ 16, 29.)  Similarly, after registering with Incognito, customers could select which narcotics to purchase from which vendor.  (*Id*.)

Incognito had a global distribution network with both customers and vendors located in several countries including the United States.  (*See* PSR ¶ 27.)  Incognito's vendors sold a broad range of narcotics including: amphetamines, cocaine, heroin, ketamine, LSD, MDMA, and oxycodone, among others.  Drugs were advertised by their potency, origin, and with ads reading, for example, "Sweet Mama's China White Synthetic *EXTREMELY POTENT*," "0.5G High POTENT White Lion Stamp Heroin .HIGHEST PURITY;" "Lucky's IRANIAN OPIUM;" "[Featured] 1G-28G Pure Colombian Cocaine (88-91%) NDD, HQ TR24;" among others.  During its history there were a total of approximately 32,000 narcotics listings on Incognito.  (PSR ¶ 27.)  After engaging in a transaction, customers rated their experience with a vendor, much like one would on a legitimate ecommerce website such as eBay.  (PSR ¶ 29.)

To increase its appeal, Lin designed Incognito to be user friendly with a professional graphical interface.  Customers could easily filter, or search, for their drug of choice.  Or, they could browse the site's listings, photos, and advertisements to decide which narcotics to order, as depicted below.





Lin also developed sophisticated backend architecture to support the site. That infrastructure compartmentalized the servers, each with different responsibilities. One server housed the "backend data," which included the nuts and bolts of the site such as vendor listings, transaction histories, and buyer login information. (PSR ¶ 31.) A second server was responsible for the Incognito Bank, which as further explained below, maintained tens of millions worth of cryptocurrency that was used to buy and sell narcotics. (PSR ¶ 31.) A third server provided security, and was put in place to thwart DDoS attacks[1] in addition to better hide from law enforcement. (PSR ¶ 31.) Lin's software enabled these servers to work in concert, on the ToR network, to deliver a seamless experience to the Incognito user base.

As time went on, Lin also developed darknet market services to help promote Incognito and facilitate illegal transactions across the broader darknet market community. Those services included an anonymous chat system, and a cryptocurrency money laundering tool. Gov't Ex. A, B. Lin also designed Incognito to include a user-to-user anonymous chat service. (PSR ¶ 25.) Incognito also had what appeared to be a "community governance" program to enable certain users (those who met certain buying or selling thresholds) to vote on rules and regulations. (PSR ¶ 25.) Although, in reality, the defendant had the final say. *See* Def. Ex. 27

### B. Lin Created and Managed the Incognito Bank

The Incognito Bank enabled Incognito to retail and distribute narcotics securely between users (e.g., buyers) and sellers (e.g., vendors). (PSR ¶¶ 23-24.) Lin developed the bank's code and managed it throughout Incognito's existence. Through the bank, customers deposited

---

[1] DDoS attacks, also known as Distributed Denial of Service attacks, are when malicious cyber actors attempt to disrupt the normal traffic of a particular server, service, or network by overwhelming the target or its surrounding infrastructure with a flood of Internet traffic. Darknet marketplaces are often the target of DDoS attacks by rival marketplaces

cryptocurrency[2] (Bitcoin or Monero) into the customer's bank account—essentially a cryptocurrency wallet[3]. (PSR ¶ 23.) Once deposited, each user's wallet was under Incognito's—*i.e.* Lin's—control. Then, after a buyer purchased narcotics from a vendor the Incognito Bank would release funds to the vendor's Incognito bank account. (*Id.*) In this way, Lin designed Incognito to serve as a financial link between vendors and customers and in so doing provided both parties a level of comfort that transactions would be consummated, while also allowing the parties to maintain distance and anonymity between each other. (PSR ¶ 24.) For that arrangement to work, Incognito customers and vendors had to place their trust in Incognito—and specifically in Lin who held the passwords to the Incognito Bank. Both vendors and buyers ordinarily could withdraw from the "bank" into their personal cryptocurrency wallets. (PSR ¶ 23.) Much like the rest of the site, Lin designed the Incognito Bank to have a simple and user-friendly graphical interface, which is depicted below:

---

[2] Cryptocurrency is a digital currency designed to work as a medium of exchange through a computer network that is not reliant on any central authority, such as a government or bank, to uphold or maintain it. Asset records are maintained by a digital ledger (also known as a blockchain), which is a computerized database that tracks cryptocurrency ownership. The digital ledger is maintained by a decentralized network of computing devices throughout the world. Cryptocurrencies are highly volatile and can be purchased through a number of methods, including through cryptocurrency exchanges, which are online services that enable users to exchange fiat currency (e.g. U.S. Dollars) for cryptocurrencies. Bitcoin is the world's most popular cryptocurrency. It is known in shorthand as "BTC." Monero is a cryptocurrency which uses a blockchain with privacy-enhancing technologies to attempt to obfuscate transactions and seek to achieve anonymity and fungibility. In shorthand "Monero" is known as "XMR."

[3] A cryptocurrency wallet can be a physical device or a software program that stores cryptocurrency passwords and allow users to access their digital currency. Wallets typically have addresses, which are a long string of characters. That "wallet address" corresponds to entries on the digital ledger or blockchain. That is, the blockchain will indicate how many digital coins a particular wallet owns.



Lin had complete control over all of Incognito Market's assets, including its bank, which is established in several ways. *First*, Lin used assets from Incognito to purchase a domain for his personal use. (*See* PSR ¶ 49.) *Second*, the FBI traced funds from the bank to cryptocurrency accounts controlled by Lin. (*See* PSR ¶¶ 54-56.) *Third*, in his post-arrest statement, Lin confirmed that he "revamped" Incognito market's Bitcoin wallet three times, which further demonstrates his control over Incognito Market assets. *Fourth*, as detailed below, when Lin shut down Incognito Market he took with him all of the assets held in deposit by the Incognito Bank.

Lin also designed Incognito to include a feature, which allowed users to transfer cryptocurrency outside of narcotics purchases. (PSR ¶ 25.)

### C.  Lin's Management of Incognito Market and Its Staff

Lin imposed certain rules and regulations at Incognito.  For example, vendors were required to "apply" to be approved to sell narcotics.  (PSR ¶ 19.) This required prospects to describe their prior experience as an illicit vendor on the darknet, identify whether they were a vendor at any other darknet markets, and pay a non-refundable fee of $750.  (*Id.*)  Further, by applying to the site, vendors acknowledged that 5% of their gross revenue was paid to Incognito, which was (along with the application fee) part of Lin's profits.  (*Id.*)

Even after they were accepted, vendors had to comply with several established guidelines imposed apparently to facilitate a better customer experience, generate demand, and increase Incognito Market volume.  Vendors were subject to removal for engaging in scams, generating a high volume of negative feedback from customers, refusing to answer inquiries from Incognito employees, and/or posting their own feedback to boost their own sales.  (PSR ¶ 20.)

Lin's design on Incognito also included a process for vendors and customers to litigate issues.  (PSR ¶ 22.)  To submit a dispute, a customer or vendor filled out a form containing information about the nature of the dispute and transmitted it to Incognito personnel.  (*Id.*)  A customer might submit a dispute if, for example, they paid for, but did not receive, narcotics. Vendors might submit a dispute if they believe a customer posted misleading negative feedback.

Like Lin's Pharoah identity, each Incognito buyer, vendor, administrator, and moderator used a particular alias which identified them on the site and various internet platforms.  (PSR ¶ 37.) From October 2020, through approximately January 2022, Incognito staff consisted of its founding members: Lin, Administrator-1, and Administrator-2.  In January 2022, Administrator-2 left the site, Def. Ex. 3; Def. Subm. at 11, and Lin increased his control.

After taking control, Lin changed Incognito's policies to explicitly welcome opioid sales, *see infra* I.E,[4] and then Lin hired a moderator ("CHS-1"). Lin did not know it at the time, but CHS-1 was a Government source who was working with the FBI. Lin explained to CHS-1 in a chat that Incognito had recently lost a team member. Seeking to gain a foothold into Incognito so that law enforcement would have access to otherwise unavailable information, CHS-1 boasted about his prior experiences at other darknet markets. *See* Def. Ex. 3 at USAO_00006418. To demonstrate his *bona fides* and get hired, CHS-1 offered to be a valuable employee who can "do a lot, more work than anyone else," and could grow marketplaces citing prior experiences. *Id*. That gambit worked. Lin seemed to appreciate the backstory and, apparently because Lin wanted to grow Incognito expressed interest in hiring CHS-1. Lin (as Pharoah) told CHS-1 "don't accept job invitations too soon" and that he would get "back to [CHS-1]" because "we'll definitely need a team increase" if Incognito was listed on a darknet news site. *Id*.

Lin further vetted CHS-1 before hiring him. ████████████ Lin chatted with CHS-1 and stated that "our team [*i.e.* Lin and Adminsitator-1] will discuss the mod[erator] vacancy internally. We'll get back to you within next week." Def. Ex. 10. Lin explained to CHS-1 "you'll need to understand that you won't be allowed to work on multiple markets if the offer is acceptance by you." *Id*. During that discussion, when asked how large Lin wanted Incognito to become, Lin said the "[s]ky's the limit isn't it?" *Id*.

████████████████ Lin hired CHS-1 as a moderator. Lin instructed CHS-1 to create an Incognito account, which Lin would grant moderator privileges to so that CHS-

---

[4] Prior to Lin's control, the site had a rule not allowing the sale of opioids.

1 could manage user tickets.[5]  Def. Ex. 19 (Lin to CHS-1: "register on incog and I'll give it mod

privs. . . .  you should be able to access user lookup, manage tickets, and manage disputes.").  As

the leader of Incognito, Lin controlled who had moderator privileges.

Before CHS-1 was hired by Lin, Lin appears to have handled customer complaint tickets

along with the other administrators.  After Lin gave CHS-1 moderator privileges, Lin delegated

much of that work to Administrator-2 and CHS-1 while he remained engaged on other parts of the

site such as promotion and coding.  ███████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████  To

resolve disputes Incognito staff could refund sales, remove customers, or take any other actions

that they deemed appropriate.  But, Lin—as Pharoah—had final say on how to handle tickets and

customer issues.  *See* Gov't Ex. D.

### D.  Lin's Promotion and Design of Incognito Led to Its Success

Lin promoted Incognito in several ways including through advertising on a popular darknet

online forum ("Forum-1") where users discuss issues pertaining to darknet markets.  (PSR ¶¶ 37-

38.)  Many illegal darknet marketplaces, including Incognito, promoted themselves on Forum-1.

It was a popular site for individuals to learn about darknet markets, and for darknet markets to

attract customers.  Forum-1 maintained sub-forums on topics such as "op-sec," "darknet markets,"

"monero," and "hacking".  Lin frequently posted on Forum-1, using the Pharoah identity, about

Incognito, cryptocurrency, and other issues related to the darknet.  (PSR ¶¶ 38-40.)

---

[5] ██████████████████████████████████████████████████████████
███████████████.

On or about October 19, 2020, Forum-1 opened a sub-forum dedicated to Incognito.  Initial posts announcing the beta launch of Incognito were posted by Administrator-2.  (PSR ¶ 38.)  But Lin announced the official Incognito launch on or about May 22, 2021:



Incognito Market is now fully developed with wonderful new features ! 🔲

by /u/pharoah • 2 years ago* in /d/marketannouncements

Dear community,

Incognito Market was developed in a tight schedule, within 20 days with brand new code from ground up. While it contains all the important features that a market requires, we never considered it a fully finished project. Our staff worked hard to undergo several rounds of rolling updates, but with the COVID situation and everything, the schedule was delayed for some time.

Incognito Market has been error-free and online for the past five months, without any major bug reports nor downtime either. It is now time to apply our second major update. This particular update improves security and completely rewrites the code into a much more flexible and modualized way in additional to two new features.

- IncognitoBot

(PSR ¶ 38.iii.)

Lin's promotion of Incognito continued for years with regular posts on Forum-1 advertising his site.  (*See, e.g*., PSR ¶ 38.)  For example:

- On May 22, 2021, Lin (as Pharoah) authored a post on Forum-1 titled, "[Incognito] is now fully developed with wonderful new features!"  The post further stated, in substance and in part, that Incognito would now offer a chat feature and a referral program, had an improved user layout, and accepted both Bitcoin and Monero.

- On July 17, 2021 Lin (as Pharoah) posted "Welcome everyone to the brand new game," which post contained a description of Incognito features—"everything we have to offer so far (trust me, more are on the way)"—followed by descriptions of unique software tools that Lin developed including the "innovative Annonguard, an automated and dynamic DDoS defense," an "Incogbot," for vendors to receive updates as to their accounts, and a "unique featuring system that makes sure featured listings are shown to the buyers most likely to be interested in them." Lin's post concluded with the text "So, what are you waiting for? Come join us… like right now?"

- On December 6, 2021, Lin (as Pharoah) posted "Incognito Welcomes Buyers and Vendors."  That post continued "we are a small but dedicated team that focuses on giving you the best market experience.  We're here to do a job, and we're here to do it well."  After listing several features of Incognito including "[a] casino (yep, you saw that right)," the post concluded "Come and give us a try, you sure won't regret it !!!"

- On December 30, 2021, Lin (as Pharoah) posted "Incognito Market: where simplicity meets shopping."  That post further stated "No matter if you're new to the darknet, or you're a season[ed] veteran, you're all welcome to join us on

Incognito Market. We love making new friends. . . .  If you've had some past experience with our feedback thread, you'll definitely be amazed at how fast we implement your suggestions in a rolling update."

- On January 19, 2022, Lin (as Pharoah) posted "Incognito Market: where innovation meets shopping."  Lin's post contained several statements about the importance of the broader darknet market community.  It then continued "[s]o anyway, back to the advertising(sorry for the rant). No matter if you are new on the darknet, or you're a seasoned veteran, you're all welcome to join us on Incognito Market. We love making new friends."

- On or about February 27, 2022, Lin (as Pharoah) authored a post in the Incognito subforum, which was titled "Explanation Unexpected Downtime – Back Online." The post stated, in substance and in part, "One of our servers in the cluster crashed, leading the site to enter a precaution state.  Currently, we have an automatic security system in place that detects system anomalies and will suspend the system or even migrate the entire infrastructure while wiping out the old cluster according to the severity.  This is to prevent LE [law enforcement] takeover or hijacking of the servers. . . .  We sincerely apologize for the downtime.  And rest assured we'll do our best to not let it happen again.  P.S. We're pushing a new major update today or tomorrow."

- On or about March 1, 2022, Lin (as Pharoah) authored a post in the Incognito subforum, which, among other things, announced, in substance and in part, a new user interface and "Punk Avatars. . . .  Added punk avatars: randomly generated icons that represent you."

- On March 28, 2022, Lin posted in celebration of Incognito's one year anniversary.  That post also extolled related services that Lin developed to help conceal Incognito market users from law enforcement and to support the broader darknet market community.  There was "Antinalysis" a service Lin deployed to help the broader darknet market community review blockchains so they can hide cryptocurrency transactions.  Lin also promoted a private email service and a chat service.

- On or about December 23, 2023, Lin (as Pharoah) posted, in substance and in part, "Merry Christmas . . . We're organizing a list of features and updates on our end, we're listening to all your feedback. Promise I'll get it all sorted out asap, after I deal with current issues at hand.  Thank y'all for three years of support. . . .  Sincerely Pharoah."

(*See* PSR ¶¶ 38, 39.)

Lin continued to be an active poster on Forum-1 throughout the duration of Incognito Market's operations.  Lin also posted about "opsec" (operations security) and darknet market

community issues, which posts appear to have been designed to increase his profile within the community. *See* Gov't Exs. E, F. Those efforts were successful. Lin's advertising and his sophisticated coding that created a vibrant narcotics marketplace, with a user-friendly graphic interface, unique software features, and tools making it appealing to vendors, were successful. Data from Incognito, which was obtained from a storage device seized pursuant to a search warrant when Lin was arrested, confirmed Incognito had a total of approximately 473,307 customer accounts, 1,832 vendor accounts, 32,755 narcotics listings, and 640,919 completed narcotics transactions. Those 640,919 transaction equate to thousands of kilograms of narcotics. Based on the data from Lin's storage device, which was categorized by the drug named in the listing, a massive volume of narcotics were trafficked through Lin's Incognito market:

| Drug | Weight |
|------|--------|
| Cocaine | 1,047.9 kg |
| Heroin | 41.66 kg |
| Methamphetamine | 1,269.72 kg |
| LSD | 990.39 g |
| Marihuana | 971.32 kg |
| Oxycodone | 4.23 kg |
| Ketamine | 767 kg |
| MDMA | 272.34 kg |
| Amphetamine | 214.41 kg |
| Fentanyl | 76 g |
| Alprazolam | 1,046 kg |
| Phenycyclidine (PCP) | 31.44 g |
| Methadone | 6.36 g |

**E. Lin's Decision to Capture the Darknet Opioid Market**

When Incognito Market was first founded, vendor drug dealers were told that they could not use the marketplace to sell opioids. This appears to be a decision made by Administrator-2, who was one of the founding members. (PSR ¶ 38.) The reason for that decision was summarized in a Forum-1 post authored on January 27, 2022. (*Id.*) A Forum-1 user inquired in the Incognito subforum, "is there any reason why opioids are not allowed on your market, but benzos are? Most

13

of which are likely presses of random powers? Also benzos can kill you at detox. It[']s a bit weird stance to say harm reduction when you guys allow listing of [research chemicals—*i.e.* designer drugs]." Administrator-2 responded "Because we can. . . . for reasons of our own that we'd prefer not to disclose, at this point in time (we may or may not change in the future, but for now), we disallow the sale of opioids and opiates." (*Id.*) The opiate ban persisted until Administrator-2 left Incognito Market.

After Administrator-2 left and Lin (as Pharoah) took full control, he quicky lifted the opioid ban, but retained a purported fentanyl ban, which Lin announced in a February 23, 2022 post:



**Blanket Ban on Opioids Lifted**

by /u/pharoah  Incogbot · 1 year ago in /d/IncognitoMarket

Dear all,

The ban on opioid products is now lifted. However, fentanyl and related chemicals remain banned.

Cheers

(*See* PSR ¶ 39.)

It was well known that explicitly permitting opioids was tantamount to permitting fentanyl on the site. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

While some responded to Lin's post opening the doors to opiates with support, the top rated response to Lin's post flagged the obvious: "Good luck enforcing the ban on fent, fenatlogues, and presumably [research chemical] opioids such as the etazene compounds which are equally or more potent than the fents. . . . This ban incentives vendors to lie when their products are tainted

with these chemicals." Gov't Ex. H. That poster continued: "So how are you enforcing that rule for vendors who are selling H[erion] either mixed with fent[anyl] or fent[anyl] doctored to fool our perceptions and appear to be H[eroin]? . . . [T]he vast majority of 'dope' imported and sold in the U.S. is tainted, the odds of them having product unadulterated with fent[anyl] or [research chemical] opioids are slim." Gov't Ex. H.

Lin responded and, stated "we'll be adding an update concerning that in a bit." In his subsequent update, Lin stated that as a "harm reduction" method Incognito would require opioid vendors to post photos of fentanyl testing strips with negative results in their listings. Gov't Ex. H at 5. But Lin's purported harm reduction methods were no more than window dressing. Of course, Lin had no way to check whether vendors actually tested the chemicals they were shipping or were just falsifying a test result. Lin knew this "harm reduction" theatre was a farce. Nearly six months after the ban was lifted, on August 3, 2022, CHS-1 messaged Lin and told him "I have a vendor [redacted] who['s] listing[s] all say fent-free, with out [sic] the required picture [of a negative fentanyl test.] When I try to delete [his listing I] get [the error message] Listing deletion failed, dependent order(s) active. I have sent the vendor a message telling him to add t[he] fent-strips." Lin responded "Hey ah, about that almost every listing that labelled fent-free doesn[']t put up fent strips..." Thus, Lin completely understood that his "harm reduction" guidelines were pointless, and his decision to encourage opioid sales on Incognito effectively gave a green light to fentanyl sales. CHS-1 tried to rectify the problem and asked Lin for guidance. *Id*. ("What do you want to do? I think I will just start contacting them and requesting that they [post the testing strips]"). CHS-1 then helped Lin modify site privileges so that such improper listings could be deleted. *Id*.

It is also of note that in response to Lin (as Pharoah)'s post announcing the change in opiate policy, a Forum-1 user named "RedLightLabs" asked "I don't see any vendors listing any h[eroin]

yet.  Is this allowed right now?"  Lin responded to RedLightLabs: "only fent and related chemicals are banned."  As further explained below, approximately six months later, and because of Lin's decision to operate the Incognito Market and encourage the sale of opioids, RedLightLabs sold a fatal dose of "oxy" laced with fentanyl to a 27-year-old Arkansan named Reed Churchill.

### F. The Overdose Death of Reed Churchill

Lin's decision to operate the Incognito market, for years, had deadly consequences.  On September 13, 2022, at his residence in Fayetteville, Arkansas, a 27-year-old male, Reed Churchill, died from consuming oxycodone pills that were laced with fentanyl and which he purchased on Lin's Incognito Market.  Churchill's body was discovered by his father who visited his son's home after his son missed a scheduled family visit.  As told by his farther, Reed Churchill was:

> face down on his couch, half on the couch and half on the floor.  I noticed the skin over his abdomen where his shirt was pulled up slightly was blue.  I knew immediately that he was dead.  I went to him and rolled him onto the floor terrified of what I was going to see.  Reed's skin was blue.  He was cold.  His arms and legs were stiff.   He had reddish fluid coming out of his mouth into his face. Despite my feeble attempts at resuscitation, I knew in my heart he was dead the minute I walked in the door.

(Gov't. Ex. J)

Churchill's body was discovered near a partial blue pill.  Twelve additional blue pills marked "M30" pills were found, along with additional assorted pills, in a prescription bottle in Churchill's residence. An autopsy report concluded that Churchill's cause of death was "fentanyl toxicity."  (PSR ¶ 34.) Churchill was a customer on Lin's Incognito Market, where he maintained an account.  (PSR ¶ 35.)  Based on data from Incognito's server, which was searched by the FBI, nine orders were placed by Churchill's account from an Incognito vendor named "RedLightLabs." "RedLightLabs" advertised the pills on Incognito as "Pressed Oxycodone m30 Pill x5."  Lin had personally interacted with RedLightLabs on Forum-1 just after Lin decided to encourage opiate

sales on Incognito.  For each sale RedLightLabs consummated on Incognito, Lin received a cut of the proceeds.

In a separate investigation, Los Angeles-based FBI agents investigating "Redlightlabs" obtained a laptop belonging to Rajiv Srinivasan which contained an "evernote" document (a shareable word processing program) that contained narcotics order histories for various "RedLightLabs" customers from May 2022 to November 2022.  (PSR ¶ 36.)  Included in that Evernote file were seven orders placed by Churchill's Incognito username, and which contained Churchill's home address as the apparent shipping address.  Notably, the Evernote entry for RedLightLabs sale to Churchill, on September 7, 2022, reflected that Churchill ordered 15 pills, which matches the data stored on Incognito's server.

Churchill was a tennis instructor at a local racquet club, where he taught the young and old how to improve their tennis game.  Gov't. Ex. J.  Sports injuries led him to pain medication and, like many others, he became dependent on it.  *Id.*  Despite warnings from his parents about fentanyl infecting the drug supply, according to his father, Reed "felt he had a trusted source for his pain med[icaiton]."  But Incognito was not to be trusted.  And now, because of Lin's Incognito Market, Reed's parents are without their only son.  In all likelihood, Lin's marketplace caused untold devastation to families like the Churchills throughout the world.

### G.  Lin Closes Incognito, Steals from His Coconspirators, and Attempts Extortion

In March 2024, Lin—acting entirely on his own—closed Incognito and secreted away money that its vendors and buyers had on deposit in the Incognito Bank.  (*See* PSR ¶ 60.)  In internet parlance this is known as an "Exit Scam."  The decision to close Incognito was not a joint decision.  It was Lin's decision, which he made without prior notice to anyone.  █████

███████████████████████████████████████████████████████████

███████████   Not only did Lin refuse to return funds that vendors and buyers held at the

Incognito Bank, but Lin also threatened to extort them. This came despite Lin claiming for years that he supported the philosophy of privacy prevalent among darknet users. Instead, Lin threatened to disclose each Incognito user's history unless they paid him. Lin was cleareyed about what he was doing and wrote on the Incognito site: "YES, THIS IS AN EXTORTION!!!"



**Expecting to hear the last of us yet?**
We got one final little nasty suprise for y'all.
We have accumulated a list of private messages, transaction info and order details over the years. You'll be surprised at the number of people that relied on our "auto-encrypt" functionality. And by the way, your messages and transaction IDs were never actually deleted after the "expiry"...

**SURPRISE SURPRISE !!!**
Anyway, if anything were to leak to law enforcement, I guess nobody never slipped up. We'll be publishing the entire dump of 557k orders and 862k crypto transaction IDs at the end of May, whether or not you and your customers' info is on that list is totally up to you. And yes...

**YES, THIS IS AN EXTORTION !!!**
As for the buyers, we'll be opening up a whitelist portal for them to remove their records as well in a few weeks.
Thank you all for doing business with Incognito Market

On March 9, 2024, after the market was closed, Lin messaged CHS-1 and stated "I'm scamming the users, but never you two [i.e. Administrator-1 and CHS-1]. I'll launder it over time and send you guys your share as agreed on." Gov't Ex. L. This further confirms that Lin acted alone when he chose to close Incognito Market, and makes clear that Lin "scammed" the "users"— *i.e.* the vendors and buyers who were also Lin's coconspirators. Lin later sent CHS-1 approximately $80,000 of cryptocurrency, a substantial sum but just a small fraction of what he kept for himself. Based on cryptocurrency analysis, the FBI assesses that Lin took approximately $1 million of crypto from Incognito, although Adminstrator-1 appears to have believed that Lin stole substantially more.

### H. Lin's Arrest

Lin was born and educated in Taiwan. In 2024 he was working in St. Lucia on behalf of the Taiwanese Government as an assistant technician stationed in Taiwan's Technical Misson. Dkt 49, Ex. 1. While working there, remarkably, Lin led a four-day training for St. Lucian police

officers about "Cybercrime and Cryptocurrency," which he bragged about on his personal Facebook page:



On May 18, 2024, Lin landed in JFK enroute to Singapore, when he was arrested by the FBI pursuant to an arrest warrant. Following *Miranda* warnings, during an hours long interview Lin informed the FBI, the following, among other things:

- After first minimizing his conduct and evading the FBI's questions, Def. Sub. at 19, Lin confirmed: "I'm Pharoah." He added "it feels good to finally say that." (Lin Intv. at 11:29.)

- In 2019 or 2020, Lin started another darknet market called "Potluck." (Lin Intv. at 11:31, 11:33.) When engaged with Potluck, Lin came to work with a former alias of Administrator-1. (Lin Intv. at 11:31.) After the Potluck site ended, Administrator-1 introduced Lin to Administrator-2 both of whom were starting Incognito Market. Lin told the FBI that he "immediately started coding Incognito, and I got it up like rather fast. I spen[t] days on it and just like . . . I just sleep, eat, write code." (Lin Intv. at 11:34.)

- "[O]riginally we were like expanding so fast, I was thinking about a fourth moderator." (Lin Intv. at 11:33.)

- Lin explained to the FBI the computer architecture of Incognito. (Lin Intv. at 11:39-40.)

- Lin stated that he was making "250K per month" operating the site.  (Lin Intv. 11:34.)

- Lin confessed that he was also the owner of "DarkNetLive."  (Lin Intv. at 11:37.) DarkNetLive was a darkweb information site that also served to market darkweb marketplaces such as Incognito.

When he was arrested the FBI seized from Lin's baggage several electronic devices including a storage device, which contained a backup of Incognito's servers and code.

## II.    The Plea Agreement & Lin's Guilty Plea

On December 16, 2024, pursuant to a plea agreement with the Government, Lin plead guilty to Counts Two through Four of the Indictment: Conspiracy to Distribute and Possess with Intent to Distribute Narcotics; Money Laundering; and Conspiracy to Sell Adulterated and Misbranded Medication.  Pursuant to the Plea Agreement, as to Count Two, the parties stipulated that the total converted drug weight was 3,485,049.66 kilograms, which yields a base level of 44.

The parties further stipulated that two levels are added because the defendant distributed a controlled substance through mass-marketing by means of an interactive computer service. U.S.S.G. § 2D1.1(b)(7).  Two additional levels are added because the defendant represented or marketed as a legitimately manufactured drug another mixture or substance containing fentanyl. U.S.S.G. § 2D1.1(b)(13).  Two additional levels are added because the defendant was directly involved in the importation of a controlled substance and/or the defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood.  U.S.S.G. § 2D1.1(b)(16)(C),(E). Under Count Three, the offense level increased to 52 due to various stipulated money laundering enhancements.  Further, because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, 4 levels were added.  U.S.S.G. § 3B1.1.  After deducting for acceptance of responsibility, the applicable offense level is 53. However, 53 is above the highest Guidelines offense level, which is 43.  Accordingly, pursuant to

20

Chapter Five, Application Note 2, an offense level of more 43 is to be treated as an offense level of 43.  With a criminal history category of I, the applicable Guidelines are life.  The Probation Department concurs with the parties' Guidelines calculation.

### III.    Objections to the PSR

Lin objects to paragraphs 14, 17, 61, and 71 to the extent that those paragraphs "characterize Mr. Lin's role as being superior to the other administrators of Incognito." Def. Subm. at 27.  It is not clear that this dispute is material because Lin agrees he was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." PSR ¶ 71; *see also* Def. Subm. at 23.  But as a matter of factual clarity, Lin is wrong.   Lin had executive authority and ultimate control over Incognito Market as evidenced by, *inter alia*, Lin's control over: Incognito staff, Incognito's computer servers, Incognito's assets, Incognito's policies, and Lin's decision and ability to shutdown Incognito Market, steal its users' assets, and extort his customer base.

*First*, during his post-arrest interview, Lin told the FBI that when he joined Incognito he "immediately started coding Incognito, and I got it up like rather fast. I spen[t] days on it and just like . . . I just sleep, eat, write code."  (Interview at 11:34.)  Lin added "originally we were like expanding so fast, I was thinking about a fourth moderator."  (Interview at 11:33.)  Accordingly, even though it appears that the initial idea of Incognito was not Lin's, he was its third employee and responsible for its code.  And moreover, even at this early point in time, Lin considered hiring a fourth individual to work for him.  Lin's hiring authority continued.  In addition to hiring CHS-1, on April 25, 2022, Lin informed CHS-1 "Hey, just to let you know. There should be a new team member on board this week. His cut comes from reserved proportion and a slice of mine, it shouldn't affect you much. Though after he's on board, should ease your workload a bit."  Gov't

Ex. M.  It is unclear to the Government whether that person was actually hired, but that Lin appears to have made a hiring decision demonstrates his authority.

*Second*, Lin's executive authority is demonstrated by his control over Incognito's servers and site features.  The defense essentially concedes this by endorsing the notion that Lin "wr[o]te the code for the website." Def. Subm. at 27.  But not only did Lin write the code, he decided and had control over the site's features. Lin's Google search history, and his postings on Forum-1, corroborate that Lin decided what features the site should offer.  For example, Lin put in place a referral program, a casino, avatars, and a bot to assist vendors, among other things.

Lin's control over the servers is also demonstrated by Lin's ability to provide others with moderator and administrator access.  That is, only Lin had the authority to grant other accounts the ability to moderate the site to manage vendor/buyer disputes, and access other site features the general public could not.  *See* Gov't Exs. C, D, N.

*Third*, Lin controlled Incognito's assets.  The passwords to the Incognito Bank—where all customer and vendor assets were stored—was essential to its operations.  Lin could (and did) decide how those assets should be spent, moved, and used.  Lin did so without votes or consultation from anyone.  *See supra* I.D.

*Fourth*, Lin decided on Incognito polices.  To be sure, when Incognito was in its infancy, Administrator-2 set policy.  But once Administrator-2 left Incognito Market in February 2022, *Lin encouraged opioid sales on the site.  See supra* I.E.

*Fifth*, Lin's overall control over Incognito is best demonstrated by his decision to close Incognito and to extort its vendors and buyers. The defense pretends this was simply an example of Lin's "technical skills." Def. Subm. at 19.  But that assertion is a missing the forest for a single tree.  Yes, Lin used his technical ability, and his sole access to Incognito's servers, to end

Incognito, take all of its money, and extort its members. More to the point, *the decision to shutter Incognito was a decision Lin made by himself.* ████████████████████████

████████████████████████████████████████████ The facts regarding the shuttering of Incognito, which the defense does not dispute, make plain that Incognito was not "a partnership." Def. Subm. 27. That Lin, and only Lin, had the power to end Incognito—and Lin in fact did so without any discussion—demonstrates by at least a preponderance of the evidence that Lin was the principal administrator of the site with unique executive authority.

## DISCUSSION

### IV.    The Sentencing Guidelines

The Sentencing Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby,* 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. The Guidelines are the starting point. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See also Gall*, 552 U.S. at 50 & n.6.

23

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)      to afford adequate deterrence to criminal conduct;

(C)      to protect the public from further crimes of the defendant; and

(D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## V.      A Sentence of 360 Months Is Appropriate

Application of the 3553(a) factors demonstrates that Probation's sentencing recommendation of 360 months is appropriate. For years, Lin played an integral role, and then eventually came to lead, an incredibly prolific, and sophisticated, drug trafficking network that hid from law enforcement in the shadows of the internet. He bears unique responsibility for proliferating the distribution of dangerous chemicals across the country and throughout the world. Lin's conduct enabled the public's access to thousands of kilograms of narcotics. *At least one man died*, and undoubtably many others suffered overdoses and even death. The suffering and devastating wrought by Lin's crimes cannot be overstated. And while communities and families suffered, Lin made millions of dollars. Lin stopped Incognito only so that he could make even more money.

Lin demonstrated a flagrant lack of respect for the law. He created and managed a drug bazaar that was designed (and existed) to thwart law enforcement efforts to stop it. (PSR ¶ 39.ii (describing "an automatic security system . . . to prevent LE [law enforcement] takeover or hijacking of the servers").) Thus, his crimes were brazen and he protected himself, and his coconspirators, though cunning application of advanced software and coding skills.

24

A sentence of 360 months would meet the goal of specific deterrence by incapacitating the defendant, who has demonstrated, by continuing his criminal activity that he will not be bound by the law or be prevented from endangering society. Lin is educated and had ample opportunities. He knew the potential risks of engaging in this conduct, but despite that sober understanding, he created a $105 million drug trafficking network, and developed software tools to help others commit crimes online. General deterrence in a case such as this one should be afforded significant weight, as online narcotics markets proliferate with damaging effects.

Separately, and in combination, these factors favor a substantial sentence far above the minimum: 360 months imprisonment meets that standard.

### A. The Seriousness of the Offense and Just Punishment

#### 1. The Extraordinary Volume of Lin's Narcotics Trafficking

The extraordinary nature of Lin's conduct is demonstrated by the magnitude of narcotics trafficked through his Incognito Market. This is not a case where a criminal defendant is responsible for a kilogram of deadly narcotics, or even hundreds of kilograms of drugs. *Lin bears responsibility for trafficking more than a ton of drugs.* To wit, more than 1,000 kilograms of cocaine; 41 kilograms of heroin; 1,200 kilograms of methamphetamines; two hundred kilograms of MDMA; and nearly one kilogram of LSD to provider a few examples. Trafficking any of these drugs on their own is incredibly serious. [6] Indeed, just 450 kilograms of cocaine (less than half of what Lin trafficked), would itself be sufficient under the Guidelines to result in base offense level applied to Lin for the cumulative weight of all the narcotics trafficked. *See* U.S.S.G § 2D1.1(c)(1).

---

[6] This is not a case where the defendant lacked visibility into the quantity of narcotics he was involved in trafficking. To the contrary, the defendant had full visibility into the staggering volume of narcotics trafficked over Incognito, and he encouraged it and enabled it. The Government appreciates that in certain cases the volume of narcotics for which a defendant is held responsible may overstate the defendant's personal culpability. This is not one of those cases.

So too if Lin were responsible for only 45 kilograms of methamphetamines. *See id.* But Lin is responsible for more than 28 times that amount—1269 kilograms of methamphetamines. Thus, the Guidelines in many ways *understate* the severity of Lin's conduct. Surely, then, a below Guidelines sentence of 360 months does not overstate the seriousness of Lin's crimes. To the contrary, the defense seeks the same sentence that this Court would be required to impose on a defendant who trafficked just one kilogram of heroin, five kilograms of cocaine, or 500 grams of methamphetamines—paltry amounts compared to Lin's offenses.

Not only was the weight of the narcotics extraordinary, so too was the magnitude of the network that Lin created and lead. Lin's Incognito platform was used by 1,832 vendor accounts. Each of those vendors was a serious narcotics trafficker in their own right.[7] Analogizing Lin's network to the physical world, this is akin to Lin controlling 1,800 street corners—and getting a cut of their revenue. But that metaphor tells half the story, Lin's market supercharged those vendors' reach from mere streetcorners to a global market of customers, which market Lin protected with anonymizing software technologies to frustrate law enforcement.

Because of Lin, those 1,832 vendors catered to 473,307 buyer accounts. Even assuming some buyers had more than one account, that is an astronomical figure that pales in comparison to the ordinary, though serious, narcotics cases in this District. Data from Incognito reveals that those 473,307 buyers were exposed to 32,755 narcotics listings. Incognito users engaged in 640,919 narcotics transactions, and Incognito grossed more than $105 million in revenue. These are astonishing figures that place Lin in the upper echelon of narcotics defendants.

---

[7] Indeed, 129 of the vendors on Incognito engaged in more than 1,000 transactions, and some engaged in far more. Eleven engaged in more than 4,000 transactions.

Lin is responsible for the enormity of Incognito.  His knowledge of internet architecture made the site function beyond law enforcement's reach; his coding skills made the site user friendly and accessible to even novice computer users; Lin empowered his vendor network with software bots to expand their markets; Lin's advertising attracted attention; and Lin's keen understanding of cryptocurrency, and creation of a "bank," was the oxygen that allowed Incognito to thrive.  Lin is an extraordinary drug dealer, and an online kingpin who, over a period of 39 months, pushed Incognito to be one of the most prolific online narcotics distributors on the internet. This all warrants a serious and substantial sentence.

2.  <u>Lin Caused Harm to Communities Around the World</u>

The narcotics trafficked on Lin's Incognito Market caused harm to untold numbers of people across the globe.  There should be no doubt that Lin's incredible volume of narcotics trafficking led to numerous overdoses and very likely several deaths.  Lin takes responsibility for one.  Reed Churchill's death evinces the "absurdity" of the claim that drug offenses are non-violent and victimless.  *See Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J. concurring); *compare* Def. Subm. at 45 ("Mr. Lin has shown absolutely no willingness to engage in violence"). Churchill's family members are victims too.  *See* 18 U.S.C. § 3771(e).  So too are the thousands of other family members who suffered as they watched their loved ones struggle with, and succumb to, addiction, and the severe consequences that flow from the Incognito market that was accessible to anyone with an internet connection.

The Government has previously provided the Court and defense counsel with letters from Reed Churchill's parents, which convey in stark and deeply moving terms the suffering that Lin has caused.  As Reed Churchill's father wrote:

> The impact of this loss on our lives has been devastating to say the least.  We've lost our son, we've lost our potential daughter-in-law and lost our potential grandchildren.  As I'm an only child, I have

27

> lost the legacy of the Churchill name. . . . . My daughter has had to move out of California to Nashville to be near her college friends. She was unable to maintain her focus on her work in CA and needed the support of close friends. My wife and I have struggled on with our work, but I have to say that I work only to stay sane. I have undergone a slowdown in my work, and I find little joy or satisfaction any longer. My wife continues in weekly counseling. I took antidepressants for a year and underwent counseling as well.

(Gov't Ex. J)

Reed Churchill's mother wrote:

> Reed died on September 13, 2022 and since that day, my family has lived with tremendous grief, guilt, anger and sadness. Thirty one months later, I still attend grief counseling. Everyday I wake up with a different painful emotion. While I am a believer in God, I continue to be angry with Him. Church is not comforting. Holidays are miserable. Just passing by the cemetery where he is buried makes me physically ill.

(Gov't Ex. P)

The harm that Lin's Incognito Market brought to many was multiplied by Lin's decision to endorse opioid sales on Incognito. According to the Centers for Disease Control and Prevention (the "CDC"), out of over 107,000 deaths from drug overdoses in 2022 (when Lin changed the opiate policy on Incognito), it is estimated that 80,590 of these deaths, or 75%, involved at least one opioid.[8] Indeed, studies show that this nation's opioid epidemic has given rise to a broader trend in which those addicted to opioids turn to using multiple substances, i.e., "polysubstance use."[9] And, Incognito did not just traffic opioids, it offered a full menu of narcotics including

---

[8] *See* CDC, Fighting Fentanyl: The Federal Response to a Growing Crisis, July 26, 2022 (statement of Christopher M. Jones, Acting Director of National Center for Injury Prevention and Control, CDC), *available at* https://www.cdc.gov/washington/testimony/2022/t20220726.htm#:~:text= Together%20we%20can%20stop%20drug,months%20ending%20in%20January%202022.

[9] *See* 'A Monster': Super Meth and Other Drugs Push Crisis Beyond Opioids, N.Y. Times, (November 13, 2023), https://www.nytimes.com/2023/11/13/health/polysubstance-opioids-addiction.html?searchResultPosition=1 ("Over the last three years, studies of people addicted to opioids (a population estimated to be in the millions) have consistently shown that between 70 and

cocaine, meth, hallucinogenics, designer drugs, and even more exotics substances like PCP. Each of those have had their own debilitating impacts on society.[10]

Thus, the defendant knowingly engaged in an activity that posed significant harm to society at large. A just sentence should reflect the real-world consequences of the defendant's conduct over a period of 39-months.

### 3. Lin Earned Millions of Dollars Leading His Drug Trafficking Network

The defendant's offenses were not the product of a momentary lapse in judgment. Rather, they required hard work and continual commitment. Lin spent hours upon hours programming computer code, solving problems, and promoting his site. For this hard work, Lin was handsomely rewarded. Lin earned at least $6 million from Incognito.[11] Indeed, as he told the FBI, Lin was

---

80 percent also take other illicit substances, a shift that is stymieing treatment efforts and confounding state, local and federal policies.").

[10] Cocaine use leads to, among other things, paranoia, psychosis, stroke, seizures, respiratory failure, organ damage, and, at times, even death. *See* National Institute on Drug Abuse, What Are the Long-Term Effects of Cocaine Use? (May 2016), *available at* https://www.drugabuse.gov/publications/research-reports/cocaine/what-are-long-term-effects-cocaine-use. Cocaine harms not just its users, but also their family and friends and the broader communities to which they belong. *See, e.g.*, *United States v. Colon*, No. 10 Cr. 197 (CM), 2020 WL 4496761, at *2 (S.D.N.Y. Aug. 4, 2020) (describing cocaine as "a highly addictive drug that destroys lives, families, and communities"); *United States v. Qayyem*, No. 10 Cr. 19 (KMW), 2012 WL 92287, at *4 (S.D.N.Y. Jan. 11, 2012) (describing study in preeminent medical journal in which cocaine was found to have "second-highest mean harm score of all twenty drugs [under study], after heroin"). "The incursion of meth has been particularly problematic. Not only is there no approved medical treatment for meth addiction, but meth can also undercut the effectiveness of opioid addiction therapies. Meth explodes the pleasure receptors, but also induces paranoia and hallucinations, works like a slow acid on teeth and heart valves and can inflict long-lasting brain changes." 'A Monster': Super Meth and Other Drugs Push Crisis Beyond Opioids, N.Y. Times, (November 13, 2023), n. 9.

[11] The value of the assets that Lin has agreed to forfeit as proceeds of the offenses was $6,385,230 on July 16, 2025, which is the date by which all assets were transferred to the Government pursuant to seizure warrants. The value of many of those assets have fluctuated over time due changes in the value of cryptocurrencies. The Government also has learned that Taiwan seized $1,994,356 worth of real property and $1,236,514 from bank accounts.

earning $250,000 *each month*.[12]  Lin is therefore different from the more common federally charged drug trafficker that, in many cases, earns a modest financial reward for their conduct.

The defense claims Lin ended Incognito because he "could no longer bear his anxiety." Def. Subm. at 19.  That assertion is unsupported and inconsistent with Lin's actions.  Lin's decision to close Incognito comes approximately two months after Lin filed a complaint with the FBI claiming that he was the victim of an NFT[13] theft from which he lost $200,000.  Perhaps upset by that loss, Lin chose not to simply walk away from Incognito.  He made a decision to steal the money that his co-conspirators had on deposit, and then tried to extort them for more.[14]

    4.   Lin Mass Marketed Narcotics on the Dark Web While Operating From
           Foreign Countries

Lin built an online platform that permitted mass narcotics trafficking across the world via the dark web.  Operating on the dark web where it is particularly difficult to identify, locate, and apprehend criminals.  Indeed, that is the very purpose of a criminal dark web marketplace like Incognito—to make it exceptionally difficult to determine who is committing crimes, and where they are located.  Lin ran Incognito, which was an English-language narcotics market seemingly aimed at the American market, from abroad—Taiwan and St. Lucia.  And despite its advanced

---

[12] From October 2020, when Incognito began, through March 2024, when Lin shuttered it, Lin deposited approximately $34 million of cryptocurrency in his cryptocurrency accounts.  Much of that was withdrawn and then redeposited.  Still, that flow of funds demonstrates that Lin was flooded with revenue.

[13] An NFT, or Non-Fungible Token, is a digital certificate signifying ownership of an item, which is recorded on a blockchain similar to cryptocurrency.  NFTs are traded, sold and purchased and have had experienced volatile fluctuations in value over the past several years

[14] ███████████████████████████████████████████████████████

technology, the simple user interface lowered the barrier of entry for both buyers and vendors. Lin even designed a bot to help vendors manage their sales across multiple online markets, encouraging them to operate multiple illicit marketplaces on Incognito. (*See supra* p. 11.) Lin also designed programs to assist online criminals generally, and he promoted those tools on Forum-1. (*See supra* page 12.)

The mass marketing that brought drug dealers directly into people's homes, and the secretive, sophisticated tactics Lin employed, separate him from conventional drug traffickers. The implementation of his offenses, and his know-how, were therefore exceptional. A very significant penalty is warranted to account for the nature, seriousness, and extraordinary nature of Lin's crimes.

### B. The Need For Adequate Deterrence

A significant sentence far above the mandatory minimum is also necessary for purposes of both general and specific deterrence. As to general deterrence, a 360-month sentence would send a clear message to others who would consider the mass marketing of narcotics online. Darknet markets are incredibly harmful to communities. And while there have been successes combating darknet markets since their advent slightly more than a dozen years ago, they remain a challenge for law enforcement. Their reliance on sophisticated anonymizing technologies, which continue to grow in complexity, requires substantial law enforcement resources to locate the infrastructure and identify the individuals behind them. Especially when they operate from abroad. This is true of online narcotics vendors—such as the 1,800 vendors that operated on Incognito—and particularly true of those, like Lin, who design, operate, manage, and lead, the marketplaces. Thus, when a leader of a darknet marketplace, like Lin, faces justice, it is particularly important for the Court to send a clear message to those that contemplate a similar course of conduct. That is achieved through a sentence far above the minimum. A sentence of 360 months achieves that goal.

As to specific deterrence, while the Government is pleased to hear that Lin now "deeply regrets" his involvement in the offenses, Def. Subm. at 30, Incognito was not Lin's only foray into narcotics sales online. Before Incognito Lin started another darknet market called "Potluck." (Lin Intv. at 11:31, 11:33.) Potluck focused on marijuana sales, instead of the hard drugs that Incognito featured. Thus, Lin's involvement in online narcotics mass marketing increased in severity over time. That is a dangerous sign suggesting a disposition to apply his considerable cyber skills to future illegal conduct. So too is the fact that Lin's programing knowledge was deployed to develop tools that aggravated the effect of the Incognito Market—including a cryptocurrency tracker and anonymous email service, which would serve to fuel communications among criminal networks.

Lin is not someone with limited prospects, without family support, or struggling with addiction. *See* Def. Subm. at 6. He is highly educated, worked for the Taiwanese government, and well understood the wrongfulness of his actions, and the potential penalties he would face. Yet, Lin did not commit a crime of opportunity. He invested years and resources into building a robust criminal enterprise. Consider too Lin's hubris, exhibited by, on the one hand, Lin leading Incognito as "Pharoah," and on the other hand, Lin teaching law enforcement about "Cybercrime and Cryptocurrency." Indeed, even months after he ended Incognito, Lin kept with him a backup of the market's data. He plainly was proud of what he accomplished. Given these factors, specific deterrence and incapacitation should play an important role in fashioning a sentence. There will be little to prevent or dissuade the defendant from launching a new drug enterprise if released from prison.

### C. Sentences of Similarly Situated Defendants Counsel in Favor of a 360 Month Sentence

Examining sentences of others involved in Incognito, and those involved in drug trafficking demonstrate the appropriateness of the 360-month sentence Probation recommends in this case.

Michael Ta and Rajiv Srinivasan were sentenced to 260 and 235 months,[15] respectively, for operating RedLightLabs, which was one vendor on Incognito.  Lin believes their sentences are reason why Lin should be sentenced to the minimum.  Def. Subm. at 46.  Lin is wrong.  *Ta and Srinivasan collectively operated just one of the 1,800 vendors on Incognito*.  Lin's role, and conduct, was far more serious, and deserves a sentence that substantially exceeds theirs.  To be sure, Ta and Srinivasan sold narcotics on seven marketplaces in addition to Incognito.  Even still, the volume of their activity pales in comparison to what Lin led on Incognito.[16]  Moreover, Lin understood that many vendors operated on several marketplaces, and he developed tools to help those vendors do precisely that.  It is true that Ta and Srinivasan took responsibility for a total of six overdose deaths whereas Lin—after initially objecting before probation—takes responsibility only for one.  The harm that RedLightLabs caused, and which Srinivasan and Ta's sentences reflect, is an example of the destruction a single vendor can bring to bear.[17]  Lin's claim that he

---

[15] *See* U.S. Attorney's Office, Central District of California, Press Release (Apr. 29, 2024), https://www.justice.gov/usao-cdca/pr/oc-and-houston-men-sentenced-decades-prison-supplying-fentanyl-and-other-drugs-sold.

[16] Ta and Srinivasan's plea agreements reflect that they conducted "at least 3,800 drug transactions to approximately 1,500 unique customers across the country, totaling at least 123,688 pills resembling M30 pills which in fact contained fentanyl, 9,363 grams of methamphetamine, 299 grams of 'China white' (fentanyl powder), 296 grams of black tar heroin, and 27 grams of cocaine."  *See United States v. Srinivasan, et al.*, 22 Cr. 183 (DOC), Dkts. 53, 69, Srinivasan and Ta Plea Agreements (C.D. Cal. April, 20, 2023 and August 1 , 2023) Gov't Ex. Q.  By contrast, Incognito conducted more than 600,000 drug transactions to approximately 400,000 customers and a drug weight in the tons.  Moreover, the amount Lin profited outshines that of Srinivasan (who forfeited less than approximately $100,000 of cryptocurrency) and Ta (who's plea agreement does not reflect any forfeiture).  *Id.*; Gov't Ex. R.

[17] Lin seeks to distinguish himself by asserting that "Ta and Srinivasan knew that they were sending lethal doses of fentanyl to unsuspecting users," to imply that Lin was not aware.  Def. Subm. at 46.  But Lin stipulated to an enhancement for representing or marketing as a legitimately manufactured drug another mixture or substance containing fentanyl.  U.S.S.G. § 2D1.1(b)(13).  Further, Lin's guilty plea to Count Four, conspiracy to distribute misbranded medication, as well as Lin's presence on Forum-1 where he participated in discussions about the prevalence of fentanyl

has a "lower level of culpability" than Srinivasan and Ta—when Lin's Incognito Market served as their platform, as well as platform for 1,831 other vendors—is meritless.  Def. Subm. at 46.

Because the scale of Incognito's operations makes Lin far more culpable than any individual online narcotics vendor, to avoid sentencing disparities Lin's sentence should substantially exceed sentences imposed on online narcotics vendors.  Contrary to Lin's request, even vendors receive sentences substantially above the mandatory minimum.  *See e.g.*, *United States v. Castro*, (SDNY) (210 months for online carfentil sales)[18]; *United States v. Orgil* (168 months for online sale of methamphetamine and fentanyl, and manufacture of MDMA and methamphetamine);[19] *United States v. Teixeira Spencer, et al.*, 21cr145 (D.C.) (JDB) (darknet vendors of narcotics sentenced to 150 months and 144 months); *United States v. Decker*, 832 Fed. Appx. 639 (11th Cir. 2020) (darknet vendor of narcotics sentenced to 140 months); *United States v. Schiffner*, 22cr217 (E.D.Va.) (TSE) (darknet vendor of narcotics sentenced to 150 months).[20]

With respect to darknet market leaders, there are relatively few such cases that compare to the scale of the defendant's crimes.  The defense points to Ross Ulbricht, the creator of Silk Road.  In that case the district court imposed a life sentence because, *inter alia*, "Ulbricht was

---

laced chemicals being sold on Incognito both demonstrate that Lin knew Incognito vendors, like RedLightLabs, were trafficking fentanyl to unsuspecting users.

[18]https://www.justice.gov/usao-sdny/pr/prolific-dark-web-dealer-carfentanil-and-fentanyl-sentenced-17-years-prison

[19]  https://www.dea.gov/press-releases/2024/05/21/dark-web-drug-vendor-and-clandestine-lab-manufacturer-sentenced-prison

[20] Lin's attempts to analogize his conduct to Ryan Scott Cochran and Binh Thanh Le, both of whom are vendors, should be rejected.  As the defense concedes, Cochran "did not operate a darknet marketplace," he was just a vendor on Incognito—thus, Lin controlled the turf where he operated.  Def. Subm. at 47. Similarly, Le was simply a vendor who sold MDMA, Ketamine, and Xanax.  To avoid sentencing disparities, Lin deserves a sentence several magnitudes more significant than Cochran and Le.

prepared . . . to protect his profits by paying large sums of money to have individuals who threatened his enterprise murdered;" "six deaths were connected to Silk Road;" "Silk Road customers transacted in approximately $183 million worth of illegal drugs;" "cyanide was . . . allowed … on Silk Road despite its singular, deadly purpose." *United States v. Ulbricht*, 858 F.3d 71, 128-130 (2d Cir. 2017). Thus, the court found aggravating factors present in Ulbricht's case, which are not present here.[21] The Government agrees that a variance below Ulbricht's sentence is appropriate. Crediting that distinction, however, does not merit the extraordinary comparative leniency that the defendant seeks. Lin created, managed, and led a platform that brought $105 million of drugs to communities around the world.

Indeed, others who were online marketplace administrators, but not necessarily leaders in control of a marketplace in the way that Lin was, were sentenced to substantial terms that far exceed the minimum sentence that Lin demands. *See, e.g.*, *United States v. Vallerius*, 17 cr. 20648 (S.D. Fla.) (RNS) (240 month sentence for oxycodone vendor who at times served as an administrator on Dream market); *United States v. Clark*, 15 Cr. 866 (SHS), (SDNY) (240 month sentence to "senior advisor" who assisted in operations of Silk Road).

Accordingly, the Court should impose a sentence in accord with Probation's recommendation: 360-months.

---

[21] Lin asserts that unlike Ulbricht, Lin did not "control[ ] and overs[ee] every aspect of Silk Road, and manage[ ] a staff of paid, online administrators, and computer programmers who assisted with the day-to-day operations of the site." Def. Subm. at 44 (quoting Ulbricht Press Release). As explained herein, *supra* III, Lin is wrong, he plainly did control every aspect of Incognito. If Lin seriously contends otherwise, then he is not accepting responsibility for the full scope of his conduct.

### D.  The Defendant's Arguments for the Minimum Sentence are Unpersuasive

#### 1.  Lin's Sentencing Manipulation Claim Fails

Lin's primary argument for the minimum sentence allowed under law, is to blame the Government and claim sentencing manipulation. Lin relies on a distorted view of the facts, and misinterprets the law.  Moreover, Lin's attempt to shift responsibility for the magnitude of his crimes calls into question whether he has actually "admitted to [his] role at Incognito," and is "[g]enuinely [r]emorseful," or just upset that he got caught.  Def. Ex. 1; Def. Subm. at 30. Apprehending a sophisticated cyber actor like Lin, who has superior technical aptitude, uses cutting edge encryption technologies, and operates in foreign countries is challenging.  The FBI, and other law enforcement agencies involved in this case, used a variety of tools to identify and arrest Lin.  One of those tools was the use of a confidential source who went undercover as an Incognito moderator.  For decades courts have endorsed the use of undercover agents as a legitimate investigative technique.  *See e.g.*, *United States v. Lau Tung Lam*, 714 F.2d 209, 210 (2d Cir. 1983); *United States v. Gambino*, 566 F.2d 414, 418-19 (2d Cir. 1977); *United States v. Dennis*, 183 F.2d 201, 224 (2d Cir. 1950), *aff'd*, 341 U.S. 494, 71 S. Ct. 857, 95 L. Ed. 1137 (1951) (C.J. L. Hand) ("Courts have countenanced the use of informers from time immemorial . . . . criminals will almost certainly proceed covertly. Entrapment excluded, . . . decoys and other deception are always permissible.").

The Second Circuit has never endorsed the notion that "sentencing manipulation" is a proper ground for a downward departure. *United States v. Bala*, 236 F.3d 87, 93 (2d Cir. 2000) ("This court has not determined whether either sentencing entrapment or sentencing manipulation is a valid departure ground."); *accord United States v. Gomez*, 103 F.3d 249, 256-57 (2d Cir. 1997).

Even where sentencing manipulation has been approved in theory, "its potential application has been limited to outrageous official conduct which overcomes the [defendant's] will." *United*

*States v. Knecht*, 55 F.3d 54, 57 (2d Cir. 1995) (citations omitted); *United States v. Gomez*, 103 F.3d at 256. "This is a due process principle allowing a court to modify a sentence if, considering the totality of the circumstances, 'the government's conduct is so shocking, outrageous and intolerable that it offends 'the universal sense of justice.'" *United States v. Beltran*, 571 F.3d 1013, 1018 (10th Cir. 2009) (citation omitted); *United States v. Gagliardi*, 506 F.3d at 148 (manipulation claim "'would likely require a showing of 'outrageous' government conduct'" (quoting *Bala*, 236 F.3d at 93)); *see also United States v. Montoya*, 62 F.3d 1, 4 (1st Cir. 1995) (finding that high showing of "extraordinary misconduct" by the government renders "garden variety manipulation claims largely a waste of time" and applicable "only for the extreme and unusual case.").[22] Where a defendant voluntarily agreed to commit the crime, he should be sentenced based on the full ramifications of his agreement. *See Id.* at 257 (affirming denial of a downward departure where the defendant "expressed neither surprise nor reluctance to continue the deal" when an informant interjected a new aspect to the defendant's criminal activities). This is especially true where the defendant was predisposed to engage in the full scope of the criminal enterprise that was discussed with the Government agent. *See United States v. Rosa*, 17 F.3d 1531, 1551 (2d Cir. 1994).

---

[22] So high is the standard that even the defendant is unable to cite a single case that found sentencing manipulation. Def. Subm. at 34-35; *United States v. Kenney*, 756 F.3d 36, 52 (1st Cir. 2014) (no manipulation); *United States v. Boykin*, 785 F.3d 1352, 1362 (9th Cir. 2015) (no manipulation where defendant unable to show investigation "solely intended to increase Boykin's sentence"); *United States v. Torres*, 563 F.3d 731, 734 (8th Cir. 2009) (no manipulation); *United States v. Ciszkowski*, 492 F.3d 1264, 1271 (11th Cir. 2007) ("Government-created reverse sting operations are recognized and useful methods of law enforcement investigation. The fact that law enforcement may provide drugs or guns essential to a willing and predisposed offender does not necessarily constitute misconduct."). So too in *United States v. Love*, which the defendant cites. 710 F. App'x 351, 354 (11th Cir. 2017). In *Love*, the district court rejected the claim in a reverse sting case, where federal agents provided the defendant seven kilograms of a substance that the defendant believed to be methamphetamine. *Id*. Thus, in *Love*, unlike the case before this Court, the federal agents arguably determined the volume of narcotics, and even that did not amount to manipulation.

i.    *Lin is Responsible For the Growth of Incognito*

Lin's contention that the FBI is responsible for the volume of Incognito's drug trafficking is wrong for at least three reasons.  Def. Subm at 12-13, 35.  *First*, and as detailed above, Lin played a prominent role personally promoting and advertising the site.  It was Lin who conceived of, developed, and marketed various features to expand Incognito's user base.  For instance, Lin added a casino, promoted the use of cyberpunk avatars, trumpeted an (alleged) community governance program, and extolled the virtues of his "Incogbot" to help vendors increase sales.  It was Lin, and at times Administrator-1, who plastered the primary space for darknet market news—*i.e.* Forum-1—with a persistent plea to the community to "Come join us."  *See supra* page 10 (quoting Lin's posts).

*Second,* Lin worked to elevate his standing in the darknet community in an effort to further promote Incognito.  Lin did this by developing tools that any narcotics darknet trafficker, or cybercriminal, would find useful.  *See* Gov't Ex. A (Lin: "Basically, the idea is to help people maintain privacy"); Gov't Ex. B.  Lin also engaged in conversation on Forum-1 about OpSec and tried to warn others about law enforcement friendly crypto swapping services.  Gov't Exs. E, F.

*Third*, the growth of Incognito coincided with the collapse of several large darknet markets: In March 2022, the administrators of World Market, which was one the largest marketplaces, conducted an exit scam and closed the site.  Then, in early April 2022, Hydra, the largest online darknet market, was seized by law enforcement.[23]  With World Market and Hydra closed, their many users went searching for a new site and found Incognito.  But Incognito's success was the

---

[23] *See* https://www.justice.gov/archives/opa/pr/justice-department-investigation-leads-shutdown-largest-online-darknet-marketplace ("Hydra Market (Hydra), the world's largest and longest-running darknet market. In 2021, Hydra accounted for an estimated 80% of all darknet market-related cryptocurrency transactions").

result of more than just fortunate timing. Lin's superior software was easy for anyone to use. In addition, Lin designed "Anonguard," which was a DDoS protection tool that keep the site up and running while others floundered under DDoS attacks. *See* Def. Ex. 27 (pharoah: "have i given you the complete run down on how we're handling the ddos?").

*Fourth*, Lin's attempt to attribute Incognito's growth to CHS-1's efforts to get Incognito listed on two darknet market listing sites—"DarkNetLive" and a second site "Listings Site-2," is wholly unpersuasive. Def. Subm. at 35-36. As an initial matter, given Lin's promotion of Incognito, he was plainly predisposed to increasing Incognito's userbase. *E.g.* Def. Ex. 10 (Lin: "[s]ky's the limit isn't it?"); Def. Subm. at 12 (describing Lin and Adminstrator-1 hired CHS-1 in part because CHS-1 would get Incognito listed). That is dispositive; there can be no sentencing manipulation as a matter of law. *See*; *Rosa*, 17 F.3d at 1551. In any event, Lin is wrong on the facts. It was Lin who succeeded in getting Incognito Market listed on DarkNetLive—and that occurred before Lin hired CHS-1. *See* Def. Ex. 3 ("[CHS-1]: are you on dnl [DarkNetLive] yet?" to which Lin responded "yea, we are on dnl."). Later, Lin and Administrator-1 asked CHS-1 to negotiate with DarkNetLive so that Lin could pay to increase their standing on the site. Gov't Ex. S (Lin: "How much [DNL] asking? [Administrator-1] told me you got a deal on the table. [CHS-1:] "[Administrator-1] said to offer [DNL] 8k for se[co]nd place and 5k for 3rd place listing on the market listing , plus 1k per month." Lin: "third is fine, . . . add these two terms. 1.[Another market] always stays below Incognito when we're still paying the monthly fee 2. Do not allow [user] comments through in a biased way. The comments are retarded srsly."). Ironically, Lin later became the owner of "DarkNetLive." (Lin Intv. at 11:37.)

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ Lin

welcomed the outcome.  *See* Def. Ex. 3 (Lin: "We'll definitely need a team increase after we get

on [Listing Site-2].").  *See United States v. Cromitie*, No. 09 CR. 558 (CM), 2011 WL 2693297,

at *3 (S.D.N.Y. June 29, 2011), aff'd, 727 F.3d 194 (2d Cir. 2013) (no manipulation where a

defendant "is already engaged in criminal activity . . . . the Government can plausibly argue that it

is doing no more than seeing if the individual has access to more illegal narcotics and is willing to

procure them. That this drives up the Guidelines and triggers some mandatory minimum is a

collateral consequence").

    *Fifth*, Lin tries to elide responsibility by asserting that because CHS-1 handled Incognito

customer tickets, Lin bears limited responsibility for what occurred on Incognito.  Not only does

this argument defy common sense, it misdescribes Lin's role.  Lin hired CHS-1, and Lin directed

his efforts.  For example, on March 31, 2022, Lin gave CHS-1 "mod[erator] priv[liege]s" on

Incognito.  Gov't Ex. T.  Lin then instructed CHS-1 how CHS-1 should conduct himself as a

moderator.  CHS-1 asked Lin, "[h]ow do you side on dispute, vendor, buyer or be fair?"  Lin

responded "fair."  Lin next explained to CHS-1 how to use the moderator panel, how to conduct

"recon" on users who wish to be vendors ("current soft criteria is 800 total sales on other markets

(from recon data)," Lin instructed); how to handle user "tickets" (i.e. complaints); and how "the

focus should be more on getting buyers, but it won't hurt to grab more vendors."  Accordingly,

CHS-1 was Lin's employee and Lin directed CHS-1 how to manage the "narcotics-related aspects"

of Incognito.  Def. Subm. at 14.  In fact, both CHS-1 and Administrator-1 had less access to the

site than Lin.  *See* Govt Ex. N (Administrator-1 informed CHS-1 "make a list and ask pharoah to give you permissions" when certain features did not work for CHS-1).

That Incognito existed at all falls squarely on Lin's shoulders.  There would be no growth without Lin's work, programming skills, and desire to keep the site open for years so that its profits could flow to his pockets.  That Incognito was prolific was the outcome that Lin desired and he was handsomely rewarded millions of dollars because when he achieved his goal.

### ii.    Lin is Responsible for the Quality of Drugs on Incognito

Lin makes an astonishing contention that CHS-1 "promot[ed] the sale of fentanyl" on Incognito.  Def. Subm. at 38.  Lin is wrong.  Lin cannot seriously dispute that the decision to allow opioid sales on Incognito was his own.  (PSR ¶ 38.viii).   And, Lin made that decision knowing full well that encouraging opioids is tantamount to welcoming fentanyl poisonings.  *See* Gov't Ex. H.  Lin's *ex post* effort to pass the buck to CHS-1 shows nothing, other than Lin's lack of personal accountability.

Similar to several other of Lin's arguments, an inspection of the evidence demonstrates that CHS-1 did *not* "tr[y] to lift Incognito's ban on fentanyl sales."  Def. Subm. at 15 (citing Def. Ex 27).  To make that argument, the defense mischaracterizes a conversation between CHS-1 and Lin.  In that conversation, CHS-1 discussed with Lin how to manage buyers on Forum-1 who were complaining that Incognito should allow fentanyl sales.  CHS-1 did not advocate that the fentanyl ban should be removed.  CHS-1 merely discussed with Lin the debate taking place in Forum-1, and the broader darknet market community, about harm reduction versus the "energy of free markets."  Def Ex. 27.  CHS-1 supported the harm reduction side.  *Id.* at (USAO_00005832) (CHS-1: "Yes, to harm reduction, we are in a powerful place to make an impact"); *id*. at USAO_00005832 (CHS-1: "harm reduction is really hard. it comes down to vendor reputation but people get greedy. but it is not smart to have bad product for long term business."); *id*. at

USAO_00005832 ("looking at how real pharma inspects so it could be inspiring. random tests are a part of the equation in my opinion but like you said not the whole solution.").

Following that conversation, Lin introduced a manipulated poll to ensure the fentanyl ban remained. Lin did not do that out of some higher moral calling. He made a sober business decision that sought to both placate Incognito users advocating for fentanyl sales, and maximize Incognito's hold over the opiate market that Lin brought to Incognito. *See* Def. Ex. 27 at USAO_00005832, 34 (Lin: "the governance section is just PR and pretense anyway. and [the customers will] shut up if the proposal is rejected/vetoed . . . . and by doing so, we gain rep on opiate vendors."). Lin also understood, as he made clear on Forum-1, that openly permitting fentanyl would attract too much attention from law enforcement. Gov't Ex. U (Lin: "Tbh [to be honest], LE [law enforcement] heat on the stuff: weapons > digital/fraud > fent > opiates > other drugs > cannabis").

In reality, Lin's decision to "ban" fentanyl, and weapons for that matter, was more about "reducing harm" to his business than protecting his narcotics buyers and their families. If anything, the conversation Lin mischaracterized as supposed proof CHS-1 wanted to lift the fentanyl ban, proves that Lin understood encouraging opiates on Incognito was equivalent to accepting that some products sold on Incognito would be laced with fentanyl. Thus, and as Lin well knew, his supposed "fentanyl ban" was not really a ban at all.

### 2.  Lin's Personal Factors and Possibility of Further Prosecution

Lin claims that his youth, his education, and his "financial anxiety" caused by the cost to fund ████████████████ are mitigating factors. Def. Subm. at 7-8. To the extent that they are, the Government submits that its recommended below-Guidelines sentence properly accounts for them. Lin was young when Incognito began, but he was mature enough to operate a global operation, and earn millions doing it. That Lin felt financially insecure because of his ████████████ does not justify the harm he caused to thousands of others. Many

individuals are in need of money, but not everyone has access to the opportunities Lin did.  Lin clearly has a superior intellect and educational credentials to match.  These are not mitigating factors.  Lin had options in life that many do not.

That Lin is subject to prosecution in his home of Taiwan is a predictable consequence of his choices.  Indeed, Lin's decision to peruse the criminal enterprise knowing about Taiwan's strict narcotics laws, and while working for the Taiwanese government no less, counsel in favor of a sentence that provides sufficient specific deterrence.

To be clear, the Government does not object to the Court considering potential penalties that Lin may be exposed to in Taiwan.  The Government has done as much in developing its below Guidelines sentencing recommendation.  But what may happen in Taiwan is just speculation. There is no guarantee Taiwan will prosecute Lin after he finishes his prison term in the United States.  And if Lin is prosecuted in Taiwan, convicted, and sentenced, Taiwan prosecutors informed defense counsel and Government counsel, that the Taiwan sentencing judge would consider Lin's sentence in this case.

Overall, the defense's request for the mandatory-minimum sentence places too much weight on personal factors and does not grapple with the host of aggravating circumstances in this case.  In full context, adopting Lin's recommended sentence would not be lenient.  It would be unjust and improper.

### 3.  The MDC

Lin relies on Judge Furman's decision in *United States v. Chavez* to argue that his conditions of confinement require a minimum sentence of ten years.  But the defendant overlooks that Judge Furman has since acknowledged that, while the MDC, "has still much need for improvement," "it is also a lot better than it was in January of last year when I wrote my opinion in *United Sates v. Chavez*."  *United States v. Reshard*, 24 Cr. 392 (JMF) (May 14, 2025), at 24-25

(citing statistics that "staffing is up to 75%, the medical services staff is significantly higher and fully staffed among burses . . . it's not nearly as bad as it was a year and half ago and it's definitely trending in the right direction.").  Indeed, other courts in this District have reached a similar conclusion.  *United States v. Jean Carlos Burgos*, 24 Cr. 650 (LTS) (May 21, 2025 plea) ("the conditions at the MDC detention facility have improved, including because staffing there has been increased"); *see also United States v. Alon Alexander et al.*, 24 Cr. 676 (VEC) (Jan. 16, 2025 bail argument); *United States v. Sandy Carazas-Pinez*, 23 Cr. 346 (JPC) (Sept. 19, 2025 sentencing); *United States v. Clinton McCullum*, 24 Cr. 667 (JPC) (Aug. 29, 2025 sentencing).  Whatever undue difficulties the MDC presents, the Government's below guidelines sentencing recommendation takes them into account.



███████████████████████████████████████

████████████████████████

## **CONCLUSION**

For years, Lin led an enormous drug trafficking enterprise. He concealed it with advanced technology and sophisticated know how. He expanded the reach of an army of drug dealers across the globe, and into the homes of hundreds of thousands of people. His conduct led directly to at least one death, and an incalculable toll to communities around the world. Lin committed his crimes even though he is intellectually gifted, had ample opportunities, and knew every step of the way that what he was doing was wrong and illegal. He earned millions of dollars, and stopped only because he wanted a sudden injection of even more money. There is an intense need to deter Lin, and others like him, who can use technology to further criminal networks and harm communities.

In view of all the circumstances of this case, including the mitigating factors, the Government joins Probation's sentencing recommendation. A sentence of 360 months is sufficient but not greater than necessary.

Dated: New York, New York
       January 20, 2026

                                      Respectfully submitted,

                                      JAY CLAYTON
                                      United States Attorney

                              By:    /s/_____
                                      Ryan B. Finkel
                                      Nicholas W. Chiuchiolo
                                      Assistant United States Attorneys
                                      (212) 637-6612 / -1247